UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LITTLE DISTRIBUTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 17-250-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| RTM OPERATING COMPANY, LLC, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This case concerns a Travel Plaza that was operated on state land along the Western Kentucky Parkway until January 2017. Plaintiff Little Distributors, Inc. ("LDI") supplied the fuel operation and Defendant RTM Operation Company, LLC ("RTM") operated an Arby's restaurant pursuant to RTM's lease with the Kentucky Transportation Cabinet ("Cabinet"). After the Travel Plaza closed, the plaintiff filed suit alleging that the defendant had failed to protect its ownership interest in the fuel equipment and that RTM remained indebted for fuel. The plaintiff also demanded an accounting. The defendant has filed a motion to dismiss Counts 1, 2, and 4 of the Complaint. [Record No. 9] For the reasons that follow, the defendant's motion to dismiss will be granted.

I.   **Background**

The Cabinet issued a Request for Proposal ("RFP") for "the design, development, construction and operation of food and fuel facilities" on the Western Kentucky Parkway in 1995. W.I.T., LLC ("WIT") submitted a written bid proposal under which it would

operate an Arby's restaurant and LDI would install a fuel operation. [Record No. 1-1, p. 3 ¶ 7] The Cabinet issued a Notice of Award in November 1995, indicating that WIT had been awarded "A Contract and Property Lease Agreement for Design, Development, Construction and Operation of Food and Fuel Service Facilities."

Following the Notice of Award, the Cabinet and WIT entered into a Lease Agreement for Service Area Restaurants, Food Operation, and Service Station at Beaver Dam (the "Lease.") The Lease period was from December 1995 to December 2015. *Id.* p. 5 ¶ 9. "[A]t the request and direction of both WIT and the Cabinet, LDI installed certain equipment specifically designed for the sale of petroleum products." *Id.* at p. 5 ¶ 10. LDI bore the cost of installation, which was $442,000.00. *Id.* Additionally, LDI and WIT entered into a supply agreement whereby LDI would maintain ownership of the Fuel Installation and would be the sole and exclusive supplier of fuel to the Travel Plaza. *Id.* at pp. 5-6 ¶ 11. Pursuant to the Notice of Award, at the end of the contract term, the Commonwealth "receive[d] the right to procure the facilities/improvements based upon the Kentucky statutes that exist[ed] at the time for state government's procurement of real property." *Id.* at pp. 22-23.

Defendant RTM Operating Company, LLC ("RTM") succeeded WIT as lessee of the Travel Plaza in 2001. RTM and LDI entered into a new supply agreement dated May 25, 2001, which provides that the Fuel Installation "is owned by [LDI]" and that "[RTM] has the right to use said equipment for the Term of this Agreement." *Id.* at p. 34. The supply agreement gave RTM the ability to terminate the agreement under certain circumstances. In the event of early termination, RTM was required to pay LDI the initial

cost of the equipment, less depreciation. *Id.* at p. 39. The agreement makes no provision for the equipment upon the supply agreement's natural expiration.

The Cabinet notified RTM that it would not renew the option on the Lease at the expiration of the initial term in December 2015.[1] *Id.* at p. 7 ¶ 14. Accordingly, the Cabinet indicated that it intended to open a new bidding process. In the meantime, the Cabinet and RTM agreed to three short-term extensions of the initial term, extending the lease period to May 2016, August 2016, and finally, to January 2, 2017. *Id.* at p. 7 ¶ 15.

LDI contends that from early 2016 through January 2, 2017, and thereafter, it made repeated efforts to communicate with RTM and the Cabinet to learn the future plans for the Travel Plaza. *Id.* at pp. 7-8 ¶ 16. LDI maintains that it did not receive any substantive responses from the Cabinet or RTM. However, LDI also alleges that in September through December 2016, LDI and RTM had "extensive and ongoing communications in a joint effort to submit a joint bid to the Cabinet for the continued or renewed food and fuel operation at the Travel Plaza." *Id.* at pp. 8-9 ¶ 20. Additionally, LDI contends that in November 2016, both parties met with representatives of the Cabinet to discuss the Travel Plaza. For a number of weeks before and after that meeting, representatives of LDI and RTM corresponded concerning the bid for continued operation of services at the Travel Plaza. *Id.*

---

[1] The Complaint states that RTM opted not to extend the Lease, but the attached Lease Agreement between the Commonwealth and RTM indicates that it was the Commonwealth that decided not to extend the Lease. [Record No. 1-1, p. 24] The Complaint further states that RTM and LDI planned to submit a joint bid after the option was not renewed. [Record No. 1-1, p. 7 ¶ 16]

LDI executed a UCC filing with the Kentucky Secretary of State in August 2016. *Id.* at p. 8 ¶ 17. The fixture filing indicated that LDI had an interest in the pumps, canopies, and other equipment designated for the sale of petroleum products. *Id.* at p. 45. LDI notified the Cabinet of its UCC filing and its ownership in the Fuel Installation the following month. [Record No. 1-1, p. 8 ¶ 18] The Commonwealth issued a letter in September 2016, advising LDI that it had not reviewed or agreed to any assignment of RTM's duties under the Lease Agreement. *Id.* at pp. 53-54. The Commonwealth also reminded LDI that the existing Lease was set to expire on January 1, 2017. It further advised that, in the event the Lease was not renewed, LDI was responsible for removing all of its movable equipment from the Travel Plaza. *Id.* at p. 54. And any items that could not be moved without damaging the Commonwealth's property would "remain with the Commonwealth upon expiration of the Lease." *Id.* LDI was notified on January 2, 2017, that the Travel Plaza would be closed effective that date and that all items at the Travel Plaza would be deemed property of the Commonwealth. *Id.* at p. 7 ¶ 15.

## II. Standard of Review

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007). In ruling on a motion to dismiss, the plaintiff's allegations are presumed to be true, and the complaint is construed in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005). While the court may not grant a Rule 12(b)(6) motion because it does not believe the allegations, "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice."

*Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). Although the court accepts the complaint's factual allegations as true, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

The court generally may not consider matters outside the pleadings without converting the motion to dismiss into one for summary judgment under Rule 56. *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 487 (6th Cir. 2009). However, the court may consider any exhibits attached to the complaint, public records, and items appearing in the record of the case, "so long as they are referred to in the complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### III. Discussion

The parties have differing views of their relationship, to say the least. They place a great deal of emphasis on whether they were engaged in a joint venture and whether RTM owed fiduciary duties to LDI. LDI contends that, in 1995, it worked in partnership with WIT to submit a bid to provide services at the Travel Plaza. RTM argues that WIT entered into the Lease with the Cabinet and that WIT "separately contracted" with LDI to supply fuel. [Record No. 9-1, p. 3] The parties agree that, in 2001, RTM acquired WIT's interest in the Travel Plaza, including WIT's interest as the Cabinet's tenant under the Lease.

#### A. Joint Venture

A joint venture, sometimes referred to as a joint adventure or a joint enterprise, is "an informal association of two or more persons, partaking of the nature of a partnership,

usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge, for gain, with each sharing in the expenses and profits or losses." *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001); *Sawyer Place Co. v. Adler*, No. 2009-CV-1112-MR, 2011 WL 43233, at *5 (Ky. Ct. App. Jan. 7, 2011). The essential elements are: (1) an express or implied agreement among the members of the group; (2) a common purpose; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *Huff v. Rosenberg*, 496 S.W.2d 352 (Ky. 1973). An equal voice means that each of the parties "may equally govern upon the subject of how, when, and where the agreement shall be performed. If the will or pleasure of one party is to control the others in these respects, there is no joint adventure." *Fries v. United States*, 170 F.2d 726, 729 (6th Cir. 1948) (internal citation omitted).

Joint control or management of the property is the most important criterion of a joint venture. *Id.* Although the parties combined their resources in various ways, the plaintiff's version of events makes it clear that the parties did not act as a joint venture with respect to the Travel Plaza. According to the Complaint and its attachments, RTM had the sole power to decide whether an extension of the Lease would be sought and whether a new bid would be made. The e-mails that LDI attached and referred to in its Complaint demonstrate that LDI was at RTM's mercy when it came to these matters. [Record No. 1-1, pp. 60-61] It is clear that LDI relied on RTM in hopes that the Lease would be extended.

Further, LDI depended on RTM for information regarding the bidding process on a potential new lease. As LDI points out repeatedly, its name was not included in the original

Lease or any amendments and it had no power to communicate directly with the Cabinet. Accordingly, LDI was without an equal voice when it came to matters involving the Lease and, as a result, the Travel Plaza.

**B.     Fiduciary Relationship**

There is no set formula for determining the existence of a fiduciary relationship under Kentucky law. As a general rule, however, such a relationship is "founded on trust or confidence reposed by one person in the integrity or fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). Ordinary business relationships conducted at arm's length do not create fiduciary relationships. And while fiduciary relationships may be informal, there must be evidence showing that "both parties agreed that one party would be acting in the interest of the other." *In re Sallee*, 286 F.3d 878, 893 (6th Cir. 2002).

> The Sixth Circuit, interpreting Kentucky law, has determined that
>
> [t]o make out a claim that a fiduciary relationship existed, the party claiming the fiduciary relationship must first show the relationship existed before the transaction that is the subject of the action. Second, the party claiming a fiduciary relationship must show that reliance was not merely subjective. Third, the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary.

*Id.* at 892.

Certainly the supply agreement alone could not create a fiduciary relationship. There is no indication that the agreement was anything other than a contract reached

- 7 -

through arm's length negotiations or that the parties did not have "an ordinary business relationship." *See Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n, Inc.*, 242 S.W.3d 359, 364-65 (Ky. Ct. App. 2007). Although RTM was responsible for remitting payments to LDI based on the amount of fuel that was sold, RTM had no discretion in handling LDI's money under the terms of the contract. *See Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 744 (6th Cir. 2014) (citing *Seaway Food Town, Inc. v. Med. Mut. Of Ohio*, 347 F.3d 610, 616-10 (6th Cir. 2003)). Further, there is no allegation that RTM was required to act primarily for LDI's benefit at any point. *See Quadrille Bus. Sys.*, 242 S.W.3d at 364-65 (citing *Steelvest, Inc.*, 807 S.W.2d at 485).

Next, the parties' longstanding relationship, standing alone, does not create a fiduciary duty. As the Sixth Circuit has explained, "[a] fiduciary duty requires more than the generalized business obligation of good faith and fair dealing." *In re Sallee*, 286 F.3d at 891. Mere subjective trust does not transform arms-length dealing into a fiduciary relationship. *Id.* (quoting *Crim Truck & Tractor v. Navistart Int'l Transp. Corp.*, 823 S.W.2d 591, 595-96 (Tex. 1992). Instead, the objective nature of the relationship must be such that the fiduciary is required to act in the principal's interest, even if it is to the fiduciary's detriment. *Id.* at 892. "Only in rare commercial cases is it reasonable to believe the other party will put your interest ahead of their own." *Id.* Based on the foregoing, LDI has not alleged facts from which the Court could conclude that a fiduciary relationship existed between the parties.

### C. RTM's "Duty to Protect" LDI's Property Interest

Even assuming that RTM and LDI were joint venturers or fiduciaries, it is unclear how this would affect LDI's claims regarding its equipment. In Count 1, LDI alleges that RTM "intentionally, negligently, and/or willfully failed to protect LDI's ownership interest in the fuel installation." [Record No. 1-1, p. 9] LDI points out that, at the end of the Lease period, the Commonwealth had the right to purchase any fixtures at the Travel Plaza. *Id.* at p. 22. LDI suggests that the Cabinet did not purchase the fixtures because WIT failed to obtain the Cabinet's approval before assigning fuel management duties to LDI. Specifically, LDI complains that RTM failed to "enter into a written agreement with LDI to secure LDI's ownership interest in the Fuel Installation, and to obtain the Cabinet's approval of such written agreement, so that the Cabinet would recognize LDI's ownership interest in the Fuel Installation, and so that the Cabinet would purchase LDI's ownership interest in the Fuel Installation upon expiration of the Lease." *Id.* at p. 10 ¶ 23.

The original terms of the RFP required WIT to identify all firms that were proposed to be a part of the project and the proposal had to indicate whether any operations would be subleased, subcontracted, or joint-ventured. *Id.* at p. 20. Further, WIT was not permitted to assign the contract in whole or in part without the prior written consent of the Cabinet. *Id.* at p. 21. LDI maintains that RTM was required to enter into an additional written agreement with LDI "to secure LDI's ownership interest" in the fuel installation, and to obtain the Cabinet's approval of such written agreement. *Id.* at p. 10 ¶ 23. LDI does not claim to have approached RTM at any point concerning such additional written agreement.

LDI may not obtain relief based on the claim that RTM breached the RFP and/or Lease. *See Sexton v. Taylor Cnty.*, 692 S.W.2d 808, 810 (Ky. Ct. App. 1985) (holding that only a party to a contract may sue for its breach). While third parties who are intended creditor beneficiaries may have standing to sue on a contract, *see Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 579 (Ky. 2004), that rule does not apply here because LDI does not seek to enforce a term of the contract. *See Prime Finish, LLC v. Cameo, LLC*, 487 F. App'x 956, 960 (6th Cir. 2012) (quoting *Olshan Found. Repair & Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. Ct. App. 2009) ("[Plaintiffs] cannot rely upon contract law . . ., [*but*] *may seek to enforce the terms of a contract* by showing that the parties to the contract intended by their agreement to benefit the third parties directly.") (emphasis added).

LDI has failed to identify a legal basis for RTM's duty to "protect" LDI's ownership interest in the fuel installation equipment. As previously explained, the parties' supply agreement provided that RTM would pay LDI the depreciated value of the equipment *in the event RTM terminated the supply agreement*. LDI does not allege that RTM terminated the supply agreement. The Court may not read words into or add conditions to a contract. Instead, it must consider the contract as written. *Freitag v. Black Diamond Termite & Pest Control, Inc.*, No. 2008-CA-1695-MR, 2008-CA-1770-MR, 2010 WL 109558, at *2 (Ky. Ct. App. Jan. 8, 2010) (citing *Alexander v. Theatre Realty Corp.*, 70 S.W.2d 380 (Ky. 1934)). The contract did not identify any other circumstances under which RTM was required to pay LDI for the fuel installation. Nor did it identify any duty to protect LDI's property interest in the equipment.

LDI has not explained how any of RTM's alleged actions (or failures to act) caused the Commonwealth not to purchase the fuel installation upon the expiration of the Lease. LDI alleged in its Complaint that the Commonwealth "did not recognize" its ownership interest in the fuel installation. [Record No. 1-1, p. ¶ 19] However, LDI attached to the Complaint a September 21, 2016 letter from the Commonwealth advising, in part, as follows:

> As you know, the existing Lease will expire effective January 1, 2017. The Commonwealth plans to issue a solicitation to identify interested parties to operate the travel plaza beyond January 1, 2017 in a manner that offers the most favorable terms and conditions and the overall best value to the Commonwealth. In the event RTM chooses not to bid on the new contract, or is not selected as the new operator during the procurement process, then it will be up to your client to negotiate a new contract with the new operator on terms acceptable to your client, the new operator and the Commonwealth. If your client chooses not to submit a bid in response to the upcoming solicitation, or is unable to reach an agreement with the new operator, then it will be your client's responsibility to remove all of its movable equipment from the travel plaza at the end of the term of the existing contract and any extensions thereto. Any items that cannot be moved without damaging the Commonwealth's property will remain with the Commonwealth upon expiration of the Lease.

*Id.* at pp. 53-54. It is apparent that the Commonwealth acknowledged LDI's interest in the property, as it recognized LDI's ability to remove the movable equipment from the property upon the expiration of the Lease.

LDI contends that RTM had a duty to pursue other means to demonstrate to the Cabinet that LDI owned the fuel installation. However, the need for such intervention by RTM is belied by LDI's own assertion that it had been heavily involved in the Travel Plaza since its inception, including negotiations with the Commonwealth. Regardless, the Lease merely gave the Commonwealth the *right* to purchase the restaurant and/or fuel station

- 11 -

improvements. *Id.* at p. 23. It did not require it to do so. LDI has not identified any authority under which RTM could have compelled the Commonwealth to purchase the fuel installation. Further, it has not explained why any of the actions it claims RTM should have taken would have made the Commonwealth any more likely to purchase the equipment. Accordingly, it is unclear how RTM failed to "protect" its interest in the fuel installation and how it was harmed by the alleged failure.

### D. Negligent Misrepresentation

LDI apparently attempts to amend its Complaint by adding a claim for negligent misrepresentation through its response to the defendant's motion to dismiss. Although LDI did not formally move to amend its Complaint, the new claim is alluded to in Count 1 and the defendant has had an opportunity to respond. The gist of the claim is that, up through January 2, 2017, RTM advised LDI that things were "business as usual" and that operations would continue until the Cabinet awarded a new contract for the Travel Plaza. [Record No. 13, p. 17] Apparently, LDI was informed later that day that operations would cease immediately. LDI's inherent suggestion is that RTM did not relay information regarding closure of the Travel Plaza in an appropriate manner.

Kentucky has adopted the Restatement (Second) of Torts § 552 approach regarding negligent misrepresentation. *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004). It is defined as:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable

reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the matter.

*Id.* LDI claims that, throughout 2016, representatives of RTM "repeatedly assured" LDI that the parties would submit a joint bid and that the Travel Plaza would remain in operation until the Cabinet made its selection. [Record No. 1-1, p. 7 ¶ 16] However, LDI contends that "RTM failed to provide LDI with any substantive information about the status and future of the Travel Plaza, despite LDI's repeated requests," until advising LDI on January 2, 2017, that the Travel Plaza was closing that day. *Id.* at pp. 7-8 ¶ 16. LDI claims that it would not have incurred repair costs in the amount of $13,420.37 had it known that there would be no extensions of the Lease beyond January 2, 2017. *Id*. at p. 12 ¶ 32.

Contrary to LDI's claim, there is no indication that it incurred repair costs in justifiable reliance on the "business as usual" statements. LDI was well aware that the Lease was set to expire on January 1, 2017. *Id.* at pp. 46, 53. It is clear, based on the e-mail exchanges provided, that both parties planned to make improvements to the Travel Plaza in preparation for bidding on a new lease. *Id.* at pp. 63, 67. Although there had been short-term extensions of the original lease, it defies logic that LDI would make substantial investments in improvements based merely on RTM's statements regarding a potential short-term extension of the Lease. If it did, such reliance was not reasonable.

LDI has not alleged any facts to suggest that RTM had advance knowledge of the Cabinet's decisions regarding extensions of the Lease. Regardless, even if RTM did not

provide up-to-date information regarding the closing date, LDI has not alleged that RTM misrepresented facts regarding RTM's failure to obtain the new lease in 2017.

### E. Claim for Accounting

LDI claims that RTM remains indebted to LDI for fuel. [Record No. 1-1, p. 14] Additionally, LDI seeks an accounting of RTM's records regarding the number of gallons of fuel sold at the Travel Plaza from May 2016 through January 2, 2017. *Id.* at p. 15, ¶ 47. An accounting is an equitable remedy and is defined as "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Karem v. Bryant*, 370 S.W.3d 867, 871 (Ky. 2012) (citing 1 Am. Jur.2d *Accounts and Accounting* § 52). An accounting essentially prevents unjust enrichment by mandating the return of any benefit received as a result of a breach of fiduciary duty. *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt, LLC*, 941 F. Supp.2d 807, 824 (E.D. Ky. 2013) (citing *Gentry v. Cremeens*, No. 2008-CA-830-MR, 2009 WL 1491358, at *2 (Ky. Ct. App. May 29, 2009)).

As previously explained, the plaintiff has failed to allege facts upon which the Court could find the presence of a fiduciary relationship. Further, the absence of an adequate remedy at law is a necessary prerequisite to the right to maintain a suit for an equitable accounting. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962). There is no indication, nor has the plaintiff alleged, that discovery would not be sufficient to remedy the issues of this case. *See 2815 Grand Realty Corp. v. Goose Creek Energy, Inc.*, 656 F.Supp.2d 707, 722 (E.D. Ky. 2009) (quoting *Digital 2000 v. Bear Comm's, Inc.*, 130 F. App'x 12, 23 (6th

Cir. 2005) ("In light of the broad discovery available to litigants, accounting actions are of dubious utility."). Accordingly, the claim for an accounting will be dismissed.

### IV.   Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. Defendant RTM Operating Company, LLC's motion to dismiss [Record No. 9] is **GRANTED**;

2. Counts 1, 2, and 4 of the Complaint are **DISMISSED**. Count 3 remains pending.

3. The defendant shall file its Answer to the remaining count of the Complaint **on or before Friday, November 3, 2017**.

This 20th day of October, 2017.



Signed By:
*Danny C. Reeves* DCR
United States District Judge